Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning and welcome to the Fourth Circuit. We seem to be very popular this morning at 8.30. We're very glad to have a large group of key debts from Virginia Military Institute. I hope that's close in Latin. So I hope you'll enjoy being here with us. Our first case is B.P.J. v. West Virginia. Mr. Block, we'll hear from you first. Let me ask before you begin. Ms. C., you're going to present on behalf of the Board of Elections, the Board of Education. Except for who? And that's Ms. Green. Okay. All right. Thank you. All right, Mr. Block. Thank you, Your Honor. Joshua Block for Plaintiff B.P.J. B.P.J. is a transgender girl in middle school who loves to run and be part of a team. Until recently, the West Virginia Secondary School Activities Commission had an internal policy that allowed transgender girls to participate on girls' teams as long as there wasn't a threat to competitive equity or safety. But West Virginia replaced that policy with a categorical ban when it passed HB 3293, which prohibits transgender girls from participating on girls' teams under all circumstances. In upholding the statute as applied... So what happens if there is a threat to competitive athletics? So that internal policy hadn't been applied... I mean, in general terms. What if there is a threat to competitive athletics? Well, I think the question is, how is that determined? They had a policy in place for determining whether there actually was one. And HB 3293, by its design, excludes all transgender girls regardless of whether there's a competitive threat. And in upholding that sweeping ban as applied to B.P.J., the district court made two fundamental errors. First, it analyzed the wrong classification. And second, it did so under the wrong standard. It analyzed the wrong classification because it treated HB 3293 as though it were a law that simply created separate teams for boys and girls, instead of analyzing it as a law that specifically classifies transgender girls based on their transgender status. The court applied the wrong standard because it refused to subject B.P.J.'s as-applied claims to an as-applied analysis. It required B.P.J. to show the law was invalid for all transgender girls instead of focusing on whether it was invalid as applied to a transgender girl like B.P.J. Can I ask you a question, counsel? Because I didn't, I don't think I read the district court opinion the same way. I thought the district court did apply an as-applied analysis and it held that the law is constitutional as applied to B.P.J. because even though there's a disconnect between her personal circumstances and the goals of the law, the state is entitled to paint with a broad brush in this context so that this law, even though it doesn't really match her circumstances, that that is not a constitutional frailty in the law. So it is constitutional as applied to her. So it seemed to me that your disagreement with the district court is on the merits. You don't think the district court is right about the breadth with which the legislature can act here? But explain to me what I'm misunderstanding, I guess, is my question. Yes, your honor. Happy to. So we certainly disagree with the district court's conception of how heightened scrutiny works. The district court collapsed the analysis into a mathematical question of whether a proxy is accurate for most people. And that turns heightened scrutiny on its head. In the VMI case, it didn't matter whether VMI was educationally appropriate for most women. All that mattered was at least some women wanted to attend and could make the grade. And so I'm by no means conceding that these particular criteria could be validly applied to anyone because of that disconnect. But I don't think that the court has to hold that the statute is facially invalid in order to sustain an as-applied challenge. Grimm was an as-applied challenge. The Supreme Court's decision in Lehrer v. Robertson. It was an as-applied challenge, but it certainly reads like a facial case. Well, your honor, I think they repeatedly say it's an as-applied challenge. They emphasize specific facts about Gavin's transition and social recognition. So I think I'd be happy to cite Grimm for the proposition that every transgender student who's recognized at school should be allowed to use restrooms consistent with their identity. I'm sure that in that case, there'll be plenty of people on the other side arguing that Grimm is limited to the high school setting or to students that have been recognized consistent with their identity. So do you think Grimm is comparable to this case? I think Grimm is directly on point to this case, your honor. In Grimm, there was a policy that separated students by what they called biological gender. The court concluded that was discrimination based on transgender status. The court examined whether the stated governmental interest was actually served by excluding Grimm from the restroom. The court concluded that privacy was not decreased when Grimm entered the restroom and privacy was not increased when Grimm was excluded from the restroom. Therefore, the policy was not substantially related to an important governmental interest as applied to Grimm. Well, this really isn't, as I understand, the West Virginia appellate's case. This really isn't about privacy. They say that there's, as I understand it, maybe incorrectly, that there's a quantitative difference between this case and Grimm. You know, Grimm dealt with restroom usage. Well, in a colloquial sense, that's not that much different than breathing or sleeping. Everybody goes. It doesn't require a particular skill set once you get past the age of four or five. So, it's just an action. But competitive athletics is substantially different, it would seem to me, than that. And I'm waiting for you to tell me why it's not. I agree that competitive athletics is different in that there's a different governmental interest that's being served here. It is still, whether or not you're applying heightened scrutiny to athletics or to restrooms, it's still a transgender classification requiring heightened scrutiny. Defendants' argument is that because it's constitutional to exclude cisgender boys from girls' teams, it must also be constitutional to exclude transgender girls. But that's a non sequitur for two reasons. First, it ignores the critical requirement that when a school creates separate teams for boys and girls, it still needs to provide equal overall athletic opportunities to them. The Constitution allows separate teams, not unequal ones. But that's not what happens when a transgender girl is excluded from the girls' team. When defendants say that a transgender girl can simply go to the boys' team, but as this Court recognized in Grimm, that completely fails to grapple with the reality of what it means to be transgender. The school district in Grimm said... Right. Again, but you're relating restroom usage on the same plane with competitive athletics. You have to in order to make that argument. Well, Your Honor, I guess it's unclear to me that the difference is in a different interest. I think defendants also say that there's a difference because there are real physiological differences that come into play and are relevant to athletics. And the problem with that argument is that BPJ doesn't have those physiological differences and HB 3293 is intentionally drafted so that it excludes transgender girls regardless of whether those physiological differences exist. Can I ask you a small factual question that just keeps bothering me about this case? So the law says where selection for such teams is based on competitive skill or the activity involved is a contact sport. There's references in the brief to BPJ trying out for the middle school track team. Are there people who try out for the middle school track team and get cut? They have basically different sort of first line, second line positions in the track team. But that's selection for the team. I mean, again, no one's arguing this, but I keep bouncing off this. I was like, this doesn't seem like a selection based on competitive skill. Well, so there is no... No one's cut from the cross country team. For the track team, not everyone can participate, but basically there's sort of a front line and a second string and depending how people are doing, they might be eligible to participate in a particular race or not. But this sort of goes back to this question about what's displacement. I think that the idea of cisgender girls being displaced by other athletes, I think the core requirement of that is that the displacement is caused by some sort of underlying unfair inherent athletic advantage or not. If there's no underlying physiological difference that gives a transgender girl athletic advantage, then coming in one spot behind a transgender girl doesn't inflict an injury that's any different from coming behind one spot of a cisgender. I suspect the individuals who are displaced would vehemently disagree with you. I noticed in some of the motions pleading when we were dealing with the injunction issue that the state of West Virginia raised substantial numbers of biological girls who were displaced. Is it your view in that circumstance there is no harm? No one likes to be one rank down than another rank, but there's no right to rank above people because of their transgender status or their race or their religion or any other criteria unless there's something that makes the competition unfair. So if we use the example of BPJ finishing first in every event, it's your view that none of the folks that finish below that person are harmed? Well, obviously that's a hypothetical, but in that situation, if there is no reason for there to be an inherent physiological advantage, then that harm is no different than any other harm of athletics. That's part of athletics is it's a competition. And so I don't think you get to choose your competitor as long as there's not an inherent physiological difference that makes it unfair. And the whole reason why this law doesn't have a connection between the criteria used and the ends that are being sought is that HB 3293 goes out of its way to select criteria that do not create athletic advantage, but do a perfect job of accomplishing the function of excluding transgender students based on their transgender status. Can I ask you a question about your as-applied challenge? Because there's a couple things I see in your brief, but I just want to give you... So let's pause it. I think you can do an as-applied equal protection challenge in a situation like this, but it can't be that it's literally unconstitutional as applied to my client and only my client. That my client is the only person in the world to whom it's unconstitutional. It's unconstitutional as applied to my client because of certain characteristics that my client has, which some number of other people may have. So like I said, you offer a couple in your brief, but I just wanted to get your... This law is unconstitutional as applied to BPJ because... Because A, she's consistently recognized in daily life at school as a girl, and B, she has not gone through endogenous puberty and therefore has none of the physiological characteristics from puberty associated with athletic advantage in cisgender boys. Those are the two criteria. So the necessary implication of that would be if we accepted that argument, the law is not merely unconstitutional as applied to BPJ. It's unconstitutional as applied to anybody else who has those two characteristics. That would be the precedential force of the court's decision. Yes, Your Honor. We're not conceding that these particular criteria could be applied to anyone, but... At least as applied to people with those two characteristics. Yes, yes. I think it's elemental that if the justification for excluding transgender students is an innate physiological difference, then that physiological difference has to be present when the exclusion is happening. And HB 3293 could have been drafted to actually adopt criteria that are relevant to athletic performance, but it doesn't. It picks criteria that define being transgender. The definition of being transgender is having a sex designated at birth that's different from your gender identity. HB 3293 expressly declares in the prefatory section, gender identity is separate and distinct from sex designated at birth and classifications based on gender identity have no legitimate relationship to West Virginia's interests. Can I ask you a question? There is this, you and your colleague on the other side have this sort of threshold debate about whether this is discrimination based on transgender status or sex discrimination. Why does that matter? What follows from that? Because either way, we're applying intermediate scrutiny, right? Well, Your Honor, I think it matters in conceiving of what's the denominator when you're analyzing what's the connection between the substantial interest, the important interest in the substantial means. The district court thought the denominator was everyone with XY chromosomes, including cisgender boys. But this law doesn't classify cisgender boys. It has nothing to do with cisgender boys. They were playing on the boys team before. They're playing on the boys team now. So when you're looking at the denominator, the denominator is transgender girls because it's a transgender status classification. That's a form of sex. Sorry, Your Honor. I'm sorry. So you're saying it matters for how we look at the fit. When we get over to doing the fit analysis, the denominator is different. I'm just not a math person. I'm trying to remember what a denominator is. Absolutely. It matters in the fit. You're looking at transgender students and then you're looking more particularly at a transgender girl like BPJ who has those two criteria that I mentioned to Judge Hayden. We haven't discussed the Title IX claim. I know my time is short. I'm going to ask you a lot of questions. We'll give you an extra minute so you can get that. So the district court's entire reasoning on the Title IX question was that the court thought that because Title IX regulations allow for sex-separated teams, that meant that they also implicitly allow for the exclusion of transgender girls. I think that's just flatly inconsistent with this court's reasoning in Grimm, where the court analyzed the restroom regulation, which had the exact same features of authorizing sex-separated restrooms and the school district argued that authorized them to exclude transgender students from restrooms consistent with their identity. And this court said, no, all that the regulation does is allow the existence of sex-separated restrooms, but it doesn't provide an exemption from the statutory prohibition on discrimination and there's nothing inherently inconsistent with sex-separated restrooms and the inclusion of transgender students. So is this subject to a spending clause challenge? Well, Your Honor, I don't think it is. Defendants haven't raised that. Pennhurst's limitations only apply to actions for damages. This is an action for injunctive relief, which is not subject to Pennhurst. And even if it were, this court in Grimm resolved the Pennhurst challenge in that case by saying that the plain text... Well, you did have two sentences and a footnote on that, but I understand. Yeah, but it was still an argument made by defendants and, you know, the court did reject it in the footnote. So it was actually litigated. Thank you very much. You have some rebuttal time. Ms. C, I assume you're going first. All right, we'll hear from you. Good morning, Your Honors, and may it please the court. I'm Lindsay C, here today on behalf of West Virginia and the other defendants, except for the SSAC, as well as Intervenor Armistead. The district court got it right that sports is a uniquely strong case where differences rooted in biology call for sex-based distinctions to help ensure an equal and fair playing field.   In the district court's words, though gender identity may not be a choice, neither is biology, and biological sex dictates physical characteristics that are indisputably relevant to athletics. The Equal Protection Clause doesn't require setting that reality aside, and neither does Title IX. West Virginia's concern to protect equal athletic opportunities mirrors Congress's. So the district court was right on the law and the record to uphold that legislative choice. So I'd like to focus first on the two purported errors that opposing counsel gave. This is not a wrong classification or a wrong standard case. And then I look into what it is, to look at the significant evidence in the record that shows that there are biology-based distinctions that are relevant to athletics, and that there is no error when the district court was applying the record in this case. Your opposing counsel says that Grimm controls both issues here, and basically the case is over. I assume you disagree, but you're going to tell us why. Yes, of course, Your Honor. I do, in fact, disagree. Grimm did not hold that every sex-based classification that doesn't account for gender identity is unconstitutional or violates Title IX. It was focused on the particular circumstances of that case. Grimm was a case where there was actually no evidence at all in the record that supported the school board's purported interest. That interest was in privacy. And in Grimm, this court said that that just doesn't account for the way that restrooms actually work. They have doors. And actually, the particular restrooms in that circumstance, the boys' restrooms, had screens and dividers between the urinals. And the school district's witness at the deposition actually said, in light of those facts, it couldn't give any reason to say why privacy was needed. So can I ask you about interest? So Judge Agee raised this, of your friend on the other side. My understanding is that the state is not seeking to defend this based on privacy, right? No. And the state, likewise, is not seeking to defend this based on what I'll call bodily autonomy, dignity kind of—because we're not talking about contact sports, at least in this case, right? And it sweeps beyond contact sports. Not in this case, yes. Safety is a concern if this works. I'm not saying safety. I'm talking about things that we would euphemistically call people's bodies coming in contact with other people's bodies in ways that people would find a violation of their sort of dignitary autonomy interests. No, Your Honor. That's not the justification that West Virginia is— The two we have here are competitive fairness and sort of safety, although your brief doesn't really talk about safety. Because, I mean, in fairness, it's not obvious to me how there's a safety interest involving track and cross-country. Yes, Your Honor. I think that's fair. The brief doesn't focus on safety because BPJ is arguing this is as applied to the particular context of track and cross-country. I think briefly on that, if there's any concern, that's not a post hoc justification because contact sport is in the law itself, and that would be the rationale for contact sports as safety. But I agree. We don't need to have that discussion. Okay. So can I ask—so we're really just down to competitive fairness. Yes. Can I ask you a hypo that I think gets to the heart of what I think is problematic about your argument there? So I want to give you this hypo. So I want you to imagine a cisgender girl who is a rising high school senior. And based on her time last year, and everyone else's times last year, she is projected to finish 10th—sorry, 9th—no, 10th at the state meet. She's projected to come in 10th place at the state meet. But then over the summer, another cisgender girl moves to West Virginia, who previously lived somewhere else. And lo and behold, girl number one is now projected to finish 11th instead of 10th because of this new cisgender girl, too. I assume the state has literally no interest whatsoever in whether cisgender girl gets beaten by cisgender girl two. Right? No, your honor. And that's because the classification there is— You wouldn't care. As the state of West Virginia is utterly indifferent to whether cisgender girl two beats cisgender girl one, right? Right. Because in that context, it wouldn't be unfair competition. It's not an unfair playing field to say that those two girls should be competing against each other. So, okay. So it's an—well, I mean, there's two problems, right? They argue that as applied to BPJ and people who have the characteristics they've identified with BPJ, well, I guess it's either—my concern on the unfair competition is, as applied to people like the plaintiff, it seems either that's just not true and the evidence doesn't support it, or the interest is no cisgender girl should ever have to suffer the indignity of finishing behind any transgender girl. And that sounds like naked discrimination for its own sake. No, your honor. I can take those on either term. Sure. Actually, that is incorrect. But I also think when it looks at the interest, this is why it matters whether we're looking at a sex-based or a transgender-based discriminatory statute. Because even BPJ is not arguing, and I don't hear BPJ's counsel arguing today, that classifying based on biological sex, so that hypothetical you gave, would fail intermediate scrutiny. Sure. I think that's why that matters, because even though it is intermediate scrutiny in both contexts, as BPJ's counsel today said, the denominator is different. So in that case, if we look at, on average, the differences between biological boys and girls, that is enough to have the substantial fit. So these individual changes... Yeah, but that doesn't go to the state interest. That goes to the fit. I guess, could I just... Does the state think, let's assume for the sake of argument, all the facts get resolved in favor of them, and there's an argument that, as applied to people like BPJ, there is no inherent competitive advantage at all. At that point, it seems like the only argument would be the state has, we just have an interest ensuring that cisgender girls do not lose ever to transgender girls. Is that an interest the state would assert? No, and that's not the interest that the state is arguing here. Okay. So that it has to be this competitive, that it has to be that there's something about this category of people that is different. Yes, there has to be something about the category, whether everyone in that category, it is fair to say that individuals in that category should compete against each other. And so can I ask you, I also think there's another layer of sex discrimination here I want to ask you about that I think is getting not... So I want you to now imagine this is a completely different hypo. Don't try to apply the previous hypo. I want you to imagine two students, both of whom were assigned one sex at birth, and they now identify as the other sex. Under West Virginia law, one of these two students is allowed to play on either team. They can play on either the girl's team or the boy's team. They can play on the team of their sex assigned at birth or the sex they identify as. And one of these students is only allowed to play on one team, and that's the team of their sex assigned at birth. And the only difference between these two students is what sex they were assigned at  In other words, transgender girls are only allowed to play on the boy's team. Transgender boys are allowed to play on either the girl's or the boy's team. Why isn't that another layer of sex discrimination? Well, first, I know this is a hypo. That's not the issue that's been raised. Totally understand. But that's also been the reason we have that. It's been long understood and the regulations for Title IX have recognized it is appropriate to have that different result when the person who's able to choose is someone who's from a sex that has historically had limited opportunities. That's why if there's not a girl's team, the girl can try out for the boy's team, but not vice versa. But your regulation isn't limited to situations where there is no girl's team. It allows a trans boy to play on either team in any sport. Yes, your honor. But I think, again, in that aspect, it tracks Title IX in the regulations. And so that distinction, that odd result, is something that's never been a concern in Title IX. But I think even more important here that actually undercuts BPJ's argument, because that shows that this is not a law that is trying to discriminate based on transgender status. If that were the case, it would say no matter how someone identifies, they can't play on the team that's opposite. Your answer, you're addressing both Title IX and equal protection now? In this particular hypo, yes. I was, your honor. Counselor, can I ask you a question about the purpose of the law and whether it discriminates based on transgender status? Just in thinking about that, can I look at sort of the larger context and other laws that West Virginia is passing, roughly contemporaneous? I mean, we heard in the en banc last month, I can take judicial notice of that, about restrictions on gender-affirming care. And I gather the state has also passed a law that will take effect shortly that prohibits gender-affirming care for transgender youth. Can I look at this law in the fuller context of what's going on here? Your honor, I'm not aware of any cases that say that the court should look at this particular law on any basis other than its own terms and its own justifications. I think that would be particularly damaging to do here, where we have a context that is uniquely strong. Because when we come to sports, that's an area perhaps more than any other biological differences are going to matter. So I think all of those other laws are important and they can be justified on their own terms. But I don't think it's appropriate. I don't see any case law that would support looking at that broader context. If anything, I think if we look at the broader context, BPJ has argued that the state has recognized BPJ's gender identity and other aspects of BPJ's participation in school through names and through other social support. So I think that only shows that this is not targeted against transgender students, but that it really is focused on this particular unique— What do I do about the title of this law? I think the title of the law, the clarification piece, is what's important here. I think there's an— I guess I'm reminded occasionally of an article that someone wrote about Brown v. Board of Education, and they said, The sovereign prerogative of the philosopher is laughter. The idea that this law doesn't discriminate on gender identity is, with respect, borderline absurd to me. I don't know how we can possibly say that a law that is overtly designed to discriminate based on gender identity doesn't discriminate based on gender identity. Ron, I do respect that position, but unsurprisingly, I disagree. I'm not surprised that you do. Let me give you my best shot why I think that's true. I think we can start with what the status quo is, because I hear BPJ's argument to say that transgender students could play on sport teams before. There's no other way to explain this other than specifically targeting transgender students. That's not the case. There's actually no example of a transgender student who has played before. What we have is the commission's separate policy. It's not the state's policy, so we don't have a state change here. We have a state policy that says if a school allows and if nobody challenges that student's participation, and if the board agrees with that appeal, then a transgender student can play. I just don't see how that double layer of protection there, and in a circumstance where a transgender student has never played, means this law is significantly changing the status quo to say that transgender students cannot participate, especially because we had evidence in the record it's not just directed at transgender students. The SSEC's witness testified at deposition there had been a recent instance of a boy asking to play on the girls' volleyball team, and this law would apply there, too. So it's not something that applies just to transgender students. But I think even taking one more step back, when we're in the Equal Protection Clause analysis, this court and the Supreme Court take seriously how a statute actually describes itself on the face. And here we have a statute that on its face says there are two related overlapping categories, but they're distinct. That's sex. That's gender identity. It says gender identity is not relevant to athletics. So we have a statute that's saying we're classifying. But as applied to at least people like the plaintiff, that statement just seems false. It's not your argument, and I'm happy, especially mindful of my time, to jump to the evidence to explain why that isn't, because we didn't really hear that from counsel from DPJ. So what we had is an argument that someone who has not gone through endogenous puberty, just none of these rationales fit. But that's not what the record says. Can I ask you about the record? Because I am just so confused here. So the district court in its second order after discovery sort of didn't do what you usually see where you go through and say, here's what's genuinely disputed. Here's what's not genuinely disputed. And I gather there's still Daubert motions outstanding on some of these experts. And so all we have is kind of like a raw record. What am I supposed to do with that? Well, first of all, there is no requirement that says the degree of detail that the district court is required to give an opinion. I'm not saying the district court did anything wrong. I'm asking you, what do I, I just, I don't really know how to deal with this raw record with outstanding Daubert motions. I understand. So on the Daubert part in particular, I think it's important to recognize there that DPJ has not raised that as a reason for automatic reversal. It was noted in the opening brief that that is a fact. We didn't get any argument that's a reason for reversal until the reply. Again, I'm not saying we should reverse on that ground. I'm not saying the district court did anything wrong. You're about to make factual arguments. Some of them are going to rest on evidence that is still contested. So I don't really know what to do. Do you have any advice for me? Yes. Let me get two frame pieces before we get there. The first is there's no reason to think that the Daubert motion would be granted, even if there were to be a remit. That's the most that would happen here. We don't have an argument. Can you tilt the microphone up a little bit? Yes. Is that better? We don't have any reason to think the Daubert motion would be granted. We don't have an argument that Dr. Brown is not qualified. It would be difficult to sustain that. He has a PhD with a concentration in the biological basis of physical activity. So there's just no reason to be concerned. But I think the other thing is because when we look at the evidence, it really matters what question the district court and then this court is answering. This is not a circumstance where we have to definitively decide, is there any biological advantage at all for someone in BPJ's case? In this intermediate scrutiny, the question is really whether the legislature had substantial evidence for that judgment. And we can see that from this court's decision in HB Rao, even in a context that involved racial classifications, this court was clear the evidence didn't have to conclusively prove the state's judgment. I think the Turner Broadcasting Company versus FCC decision from the Supreme Court is helpful there too. It said in an intermediate scrutiny context, the question is not whether the legislature was right as an objective matter, but whether its decision was reasonable and supported by substantial evidence. So even if we have a classic dispute over which expert to credit more and who may have sort of the better sense. But we have before that even. I mean, the district court granted summary judgment in favor of you without resolving their objections to one of your experts. So it seems to me sort of as a civ pro matter, we can't consider any of the evidence the district court has not ruled on the admissibility in deciding whether to uphold summary judgment for you. That just seems like civ pro 101, right? Well, Your Honor, there are actually no cases from the circuit that hold as much. Well, OK. There are cases that hold you can't consider inadmissible evidence in granting a summary judgment motion, right? Yes, that is true. That it can't be inadmissible. But there are not cases that say the district court has to go through that analysis specifically. In fact, how can we consider evidence that the district court has not yet decided is admissible in the face of an objection that it's inadmissible? Well, first of all, we don't have an objection in front of this court that it's inadmissible. Sure. Fair enough. Wrong there. And so again, if the court is inclined to rule on this ground, all that would happen would be a remand, which would be futile because we don't have any basis here from BPJ why those Daubert motions would be granted. But again, this court has... The district court, as I... I'm not saying this is grounds for reversal, but I'm just sort of trying to struggle. It's an unusual combination of orders from the district court. And so I understood the district court to be basically, to not be revisiting the findings it relied on in its first order. Simply to be saying in the second order, yeah, yeah, yeah. There's no competitive advantage for BPJ, but it doesn't matter because the state doesn't have to draw such precise lines in this context. So why don't we just have to kind of take the facts as the district court was assuming them to be and go from there? I think the court certainly should. And I think the difference between the preliminary judgment and summary judgment order is at the preliminary injunction, there had not been the full evidence on the state and the other defendant's side. The district court didn't... That would make sense if in the second order, the district court said, the first time I thought BPJ had no competitive advantage. Now I think she does. That's not what the district court said. The district court said both times BPJ has no competitive advantage. The first time he thought that the district court thought that mattered. And the second time the district court didn't. But the district court didn't make any new factual findings. I read that differently. And I think it's the line where the district court says that there are thousands of pages of the record that show there's significant disagreement over whether and to what extent any sort of interventions can change any pre-existing biological differences. The other thing that's different is at the PI stage, there was no evidence... Post-puberty interventions. I know that the district court, without making any findings, alluded to disputes about whether post-puberty interventions are effective. But my understanding of the... I don't see any fact-finding in that second order saying that for girls like BPJ who don't go through endogenous puberty, there's a real factual dispute as to whether there's a competitive advantage. But maybe I missed that. I think there's two answers. I think the first is we do have the district court saying it analyzed the whole record that that's in the opinion. And courts usually trust district courts to speak through what they say. And when we look to that whole record, there's evidence that shows that there are biological differences that start before puberty. That is not disputed. The only dispute is how significant those differences are. And do you... Is your position that the district court relied on that in reaching its conclusion in the second order? Yes, Your Honor. That's how I read the language that says looking at the record as a whole and the thousands of pages. But again, even if this court were to disagree, this court can affirm on any ground that's evident from the record. The record does show those differences exist. When the only dispute is about the significance between them in a context where seconds and inches are the difference between places, the fact that those distinctions may be minimal in BPJ's terms doesn't decide this case. But what decides this case is that those differences exist and that is undisputed in the record. All right. We gave counsel an extra minute. If you want to tell us anything else rapidly. While we're talking about the evidence, then let me point the court to some of the other record evidence that I think is critical. There is that first bucket of evidence that was different from the PI stage that shows that there are pre-existing differences that arise before puberty. That makes this case very different from the Ninth Circuit's Hecox decision, for instance, where the records show that all differences arose from puberty. There is also evidence that shows... Is that record evidence entirely in your disputed expert report? Is that evidence of pre-puberty distinctions anywhere other than in documents whose admissibility that this report didn't rule on? It does come from the expert reports. Although I would point out that every expert here had a Daubert report filed. So that is true for BPJ's experts too. And even if we look at BPJ's experts, even there we have a report that shows that when you have interventions after puberty that it's not enough to erase those damages. All BPJ's argument is there are no studies that specifically look at the context of pre-pubescent individuals who start puberty blockers. It is true that they are not studies. They just do not exist at that precise level. But all the evidence that does exist shows that puberty blockers are not enough to significantly erase those. All right. Thank you very much. Ms. Green. Thank you, Your Honor. Remind us, who is your client here? West Virginia Secondary School Activities Commission, WVSSAC. All right. May it please the Court. The District Court committed error in finding entwinement and control relative to the SSAC. The commission is a private corporation founded in 1916. And as a matter of West Virginia law, its duties have not changed over time. And yet this is the first finding in that over 100 years that it is indeed a state actor. After all, it is undisputed that the state will promulgate and have sole authority over any enabling regulations, such as they do their own 2.0 rule. Therefore, the authorities cited by the District Court and by the plaintiff are inapposite here. So Brentwood, Communities for Equality, Yellow Springs, McGee, Alston, they all arise from an action taken by an athletic commission, such as WVSSAC, that became a challenged action and an alleged deprivation. SSAC has not acted, is not slated to act. Assembly Counsel, just so I understand your argument, is your argument that the commission is not a state actor or is your argument that the plaintiff is not allowed to bring a pre-enforcement action here? Well, both. We're not a state actor, but an enforcement action against us would be meaningless. We're not enforcing. We're not writing the regs. We don't enforce the regs. We have no role here. So we do have a role in other instances. If we look at Brentwood. Did you raise a pre-enforcement action? Defense. Did you raise a pre-enforcement action defense as opposed to I'm just not a state actor? We did partially. Early on, we started with pre-enforcement because we do have administrative regulations. We have no administrative regulation tied to this process. And we're not slated to have any administrative regulations. Our internal policy was the first thing out of the box this morning. And that was a board policy never used, never publicized. And it just shows that West Virginia was preparing for these issues to come. But the legislature has spoken as to how West Virginia will handle these policies, these issues, these decisions. And the legislature has left SSAC out of that process. So we say that this is not really in terms of ripeness when right says when, not if. We think this is more if. We don't. SSAC has no role under these regulations. So as opposed to... I'm sorry. Your position is that the commission will not be enforcing. You have no role in enforcement of this statute going forward. I'm just trying to distinguish an argument that you are not a state actor from an argument that this is premature. So if it's premature, that suggests that at some later date, you will have a role in enforcing the statute. And we have no role now. And part of our concern is it has... There are no regs yet, Your Honor. So we'll eventually be enforcing this statute, but you're not enforcing it yet. Is that your argument? Well, there's only one other state reg embedded in SSAC and we've never enforced that. That's a 2.0 rule. So if there is ever an enforcement rule by SSAC, it's unclear what that would be under a reg. That's not our reg. That we have no power to amend, revise, waive. So the 2.0 rule, only the state board can waive that. And this is set up exactly like the 2.0 rule. All right. Thank you very much. Thank you. Mr. Block, you have some rebuttal time. Thank you, Your Honor. I just want to begin with the evidence issue that my colleague brought up at the end. In the Arizona case, in Doe v. Horn, the recent case decided by the District of Arizona, the court there considered all of the evidence that my friend is referring to and concluded that the inferences drawn from that evidence to suggest that there were pre-pubertal advantages was baseless and unreasonable. So that was a PI posture. So the court there was a fact finder. It wasn't summary judgment. But I think if you want an explanation for why none of their evidence actually establishes what they say it establishes, the Doe v. Horn opinion is a great source for that. There's also an allusion to a conversation between the athletic commissioner and someone who wanted to play volleyball. There's actually a standing hearsay objection to that as well. And there's no evidence that that conversation was before the legislature really acted. Am I right that both sides moved for summary judgment in this case? Yes, Your Honor. I'm just experiencing frustration. Like, why are we doing this on summary judgment? Why are we not having actual factual findings? Well, Your Honor, I do think that even if you accepted everything their expert says, the expert concedes that the vast majority of advantages come from puberty. The expert concedes that any differences before puberty are minimal. And I do think that just as a matter of law, the very minimal differences identified by the other side cannot sustain this sweeping categorical ban. So this is sort of a flip side of this question I asked your colleague, right? So in order to not only overturn a grant of summary judgment against you, but to direct the entry of summary judgment in favor of you, I think the corollary to what I said to Ms. C is we would have to assume that all of their evidence is admissible, right? Yes, Your Honor. And I do think the court could reverse and say we're entitled to summary judgment, but I also obviously have no objection to the court vacating and remanding if that's what the court chooses to do. I do want to make one important point about the Nguyen case, which is brought up by the other side in their briefs as sort of the best support for their argument that a classification doesn't have to serve its objectives in all instances. And I think that that language has to be taken in context of the rest of the opinion. The Nguyen court also emphasized that the law they were examining imposed what the court said was a minimal burden and to not create any disrespect or dignitary harm. And in Sessions versus Morales-Santana, the court again distinguished Nguyen on the point that Nguyen involved a minimal burden. And so maybe those factors hold true when you're talking about cisgender boys who then have boys teams to play on and aren't stigmatized by playing on boys teams, but they're certainly not true when it comes to the exclusion of transgender girls. So I do think that the effect of the classification, the harm it inflicts, is part of a heightened scrutiny analysis. You can't just take that line from Nguyen and transplant it to other classifications. And then, although I really hesitate to disagree with you, Judge Haydens, I do want to correct one small thing, which is that the commission's regulations prohibit girls from playing on boys teams if there's a girls team available. So not under the statute, but under the regulations, a transgender boy would presumably be prohibited. But under the statute. The statute says that, right? Under the statute, yes. But I do think the fact those regulations exist are important because I think it shows how implausible it is that BPJ could participate on a boys team and not suffer a dignitary harm. This isn't a situation like the football team or the hockey team where cisgender girls participate on it and it's not in conflict with their identity as cisgender girls. For the track team or cross-country team, BPJ would not be the only girl required to be on the boys team. She'd be the only girl even allowed to be on the boys team. So I do think that heightens that stigma and humiliation. And finally, I do want to completely agree with another thing that Judge Hayden said, which is that the objection here is really to the mere presence of transgender girls on the team. Not to any competitive unfairness, but to this presumed dignity objection to having placed behind a transgender girl regardless of whether in this individual case there was any inherent athletic advantage. And I do think that that cannot serve as a basis for discrimination under this court's precedence or under the Supreme Court's precedence. If there are no further questions, I'll... Thank you. Thank you, Mr. Block. I want to thank both counsel for their... or all counsel for their arguments today, realizing we're probably only a way station on the way to the Supreme Court. But we appreciate everything that you brought before us. We'll now come down and greet counsel and move to our second case.
judges: G. Steven Agee, Pamela A. Harris, Toby J. Heytens